BEST v. KESSLER.

(Circuit Court of Appeals, Seventh Circuit. April 12, 1904.)

No. 1,002.

1. LIBEL—DAMAGES—EVIDENCE ON QUESTION OF REPUTATION.

Where plaintiff in an action for libel took the stand and testified as to his standing and reputation in the community, a cross-examination, which elicited the fact that he had been a gambler for large stakes, and other facts which would tend to affect his reputation, was proper and pertinent to the issue on the question of damages, and the exclusion of such cross-examination from the jury on such issue, while the direct testimony was allowed to stand, was error.

2. APPEAL—ASSIGNMENT OF ERROR—SUFFICIENCY.

The rule of the Circuit Court of Appeals which requires an assignment of error relating to the charge of the court to state distinctly the grounds of objection, does not require the court to refuse to consider an assignment which merely sets out the language objected to, where the objection as clearly appears from such language as it would if the assignment were further elaborated.

In Error to the Circuit Court of the United States for the Eastern District of Wisconsin.

F. C. Winkler, for plaintiff in error.

Nathan Glicksman, for defendant in error.

Before JENKINS and GROSSCUP, Circuit Judges, and BUNN, District Judge.

BUNN, District Judge. This is an action for libel for the publication of an article in the Germania, a German newspaper of the city of Milwaukee, on March 30, 1902. The article, as published in the Germania, was a German translation of one which first appeared in the Rider and Driver, a paper published in New York City on March 22, 1902. The article charges fraud and misconduct on the part of the defendant in connection with a matter which had been discussed in the newspapers relating to the alleged fraudulent substitution of a certain French wine exploited by the plaintiff, and known as "White Seal," made by Moet & Chandon, in France, in the place of a German wine known by the name of "Rheingold," on the occasion of the christening in New York Harbor of the German Emperor's yacht Meteor. The article assumes the truth of such fraudulent conduct, and that the defendant had been guilty of causing a bottle of his champagne to be clandestinely substituted for the German bottle which the Kaiser wished to have used at the christening of his yacht under the auspices of his brother, Prince Henry, and designates the plaintiff as a most disgustingly vulgar and objectionable wine exploiter, and accuses him of clandestine and dishonest practice in connection with the transaction.

The defendant's answer justifies the publication of the article on the ground of its being true, but on the trial no proof was given of its truth, and, the publication being conceded to be libelous, the case resolved itself into a mere question of the extent of the injury to the plaintiff's reputation and the amount of damages thereby sustained.

In a libel suit the plaintiff's reputation is in issue, as the injury to that is the principal measure of damages. The defendant may always attack the plaintiff's standing and reputation if he wishes to do so. It is presumed, however, to be good until the contrary is shown. The plaintiff had alleged in his complaint that he was at all times of good name, fame, and credit, and of good reputation. To strengthen the presumption of law in his favor, he introduced on the trial three several depositions by citizens, bank presidents of New York, to prove his good standing. One of the witnesses named among the directors of his bank such notable men as Mr. Alexander, Mr. Coler, Mr. Chauncey M. Depew, Kuhn, Loeb & Co., Mr. Gould, and others. Not content with the testimony of these witnesses, the plaintiff, to further substantiate a character which had not been attacked, himself took the stand to make more clear his standing and good name. He had lived in New York City 32 years. Was president of the George A. Kessler Company, sales agent for the champagne wines of Moet & Chandon, of Epernay, France. The firm business was very extensive throughout Europe and in every city in the United

States, Canada, and in Havana. In 1902 he was a member of the Chamber of Commerce of the city of New York, and still was, and of the New York Board of Trade and Transportation Company, and over half the charitable organizations in New York. Such was the rather enviable and exalted standing which the plaintiff gave to himself in order to enhance the damages. This evidence was all admitted against the defendant's objection. On cross-examination he was asked if he had not gambled a good deal, and he said he had. In the summer of 1901 he had lost a large sum of money in Saratoga in the clubhouse of Richard A. Canfield. "Q. How large a sum? A. $13,-500," which he paid, and had the receipt in his pocket. In answer to the question whether he had gambled for women in gambling houses, he said, "I may have in a friendly way, over a supper or dinner, or something that happens in the summer time—recreation. Q. In the summer of 1898, were you giving a supper at Saratoga to three ladies, and offered to play for them for something, and go out, and after a little return and bring back $275, or thereabouts? A. I do not recollect the fact. It may have been. Q. Have you been an operator in stocks to a considerable extent? A. To a very large extent, yes. Q. How many deals did you have up to the time of the panic in May, 1901, when the Northern Pacific went up kiting? A. I had a great many. Cannot tell how many. I defaulted on none. I had a dispute with one house that owes me $750 that I am suing them for. They are suing me for $180,000, which is coming up next month. Q. That matter has been ventilated in the newspapers a great deal, has it not? A. The case has been cited in the newspapers. Q. You had an acquaintance with Vera Douglas some years ago, did you not? A. I knew the lady. Q. A good deal was published in the newspapers about you and her, was there not? A. No, sir; there was not. There was in one paper some silly article. It was false and ridiculous, like other statements and reports that get in occasionally. Q. You had a little episode with a Spanish actress, Otera, at one time, did you not? A. No, sir; I did not. Q. Didn't you know her? A. I simply met her. I did not know her. Q. You knew a sister of hers? A. Never. That is one of those blackmailing things. I threw a man out of the office because he published that article. It was afterwards retracted under oath by Otera herself before the court. She was arrested for it." This evidence was legitimate cross-examination on the one subject upon which plaintiff's testimony in chief was directed, which was the matter of his reputation and credit, and was given without objection. In giving the case to the jury, this evidence of the plaintiff on cross-examination was all taken from the jury on the question of his standing and reputation. It bore on the very matter at issue, and shaded off the likeness which the plaintiff and his witnesses had made of himself. It was needed to complete the picture. Without the shades as well as the lights, the portrait would be incomplete. This evidence was offered and admitted without objection on the question of the plaintiff's reputation and standing. That was the subject at issue, and the testimony on both direct and cross examination had no other aim or bearing.

The court charged the jury that no testimony had been introduced

which tends to impeach the plaintiff's character so far as it is affected by the issues in this case. That the testimony which the plaintiff has been allowed on cross-examination of inquiries made as to the gambling and stock operations and things of that kind was received and allowed only upon the question of his credibility as a witness in the case, and not as affecting his reputation or character, for which he was entitled to compensation if an injury was occasioned thereto by the libel. Exceptions were taken to this charge, which we think are well sustained, and that the charge was erroneous. How much weight it would have had with the jury cannot be known. That was a question for the jury. But that it was most likely to have some influence on the question of damages is altogether probable. It can hardly be said that a business man who sues for injury to his standing and reputation in the community where he lives, but who confesses himself to be a gambler for large stakes, and who visits gaming places in company with women, should be regarded by the jury as necessarily having a reputation above reproach.

One of plaintiff's witnesses was asked the question whether plaintiff was not regarded in the community as an honorable man. The answer was, "In a business way, yes." But a business man who is a gambler would hardly be trusted in a matter of business with the same faith and credit as one who is not affected by such a vice. The question was altogether one for the jury, and the cross-examination should have gone to the jury with the plaintiff's testimony in chief as a part of the case.

An exception was taken by counsel for defendant in error to the sufficiency of the assignments of error. It is apparent that there has not been a complete and literal compliance with rule 2, which provides, among other things, that when the error relied upon relates to the charge of the court the assignment of error should state distinctly the grounds of the objection to the instruction. The assignments of error relating to the matter in hand are as follows:

"(14) The court erred in charging the jury in the following words: 'And no testimony has been introduced which tends to impeach his character so far as it is affected by the issues in this case.' (15) The court erred in charging the jury in the following words: 'The testimony which the plaintiff has been allowed on cross-examination of inquiries made as to the gambling and stock operations and things of that kind was received and allowed only upon the question of his credibility as a witness in the case, and not as affecting his reputation or character, for which he was entitled to compensation if any injury was occasioned thereto by the libel.' "

The grounds of objection to these instructions are not set out further than they appear upon the face of the assignments—quite as clearly as though the record were incumbered by the injection of an argument into the body of each of the two assignments. It is not possible that either the court or counsel could be misled by these assignments, or have a doubt as to their proper meaning. Besides, the same rule provides that the court, at its option, may notice a plain error not assigned. Although the assignments are not in strict accordance with the rule, we think the court should take notice of tue error.

Judgment reversed, and cause remanded for a new trial.